IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
DELTA DIVISION

JOHNNY HARRIS                                                           PLAINTIFF

v.                              Case No. 2:21-cv-00040-LPR

WEHCO VIDEO, INC., *et al.*                                            DEFENDANTS

<u>ORDER</u>

This is a race discrimination case.   Plaintiff Johnny Harris was a salesman for Defendant East Arkansas Video, Inc., starting in 2012.[1]   For most of his tenure, Mr. Harris was paid only via commissions and had no minimum sales requirement.[2]   In 2020, however, Mr. Harris's non-salaried-commission-only position was eliminated.[3]   At this time, Mr. Harris was transferred to a position with a salary (in addition to commissions) and a minimum sales requirement.[4]   But, Mr. Harris was given this position subject to certain probationary conditions.[5]   Before he could receive the salary, he first needed to prove that he could consistently meet the position's bi-weekly minimum sales requirement.[6]   Long story short, Mr. Harris was not able to consistently meet the minimum sales requirement,[7] he never received the salary,[8] and he ultimately resigned.[9]

---

[1] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 2.   WEHCO Video, Inc. is the parent company of East Arkansas Video, Inc.   *Id.* ¶ 3.

[2] *Id.* ¶¶ 10–11.

[3] *Id.* ¶ 15.

[4] *Id.* ¶¶ 17–27.

[5] *See id.* ¶ 26.

[6] *Id.* ¶¶ 24–26; *see also* Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 42.

[7] *See* Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 37, 49–50; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 45.

[8] *See* Harris Dep. (Doc. 90) at 163–64.

[9] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 2.

This case concerns Mr. Harris's pay and treatment between his mid-2020 transfer and his August 2021 resignation.   In January of 2021, Mr. Harris filed an Amended Charge of Discrimination with the EEOC alleging that East Arkansas Video was paying Mr. Harris (who is Black) less than its white salesmen.[10]   Mr. Harris further alleged that he was being denied access to East Arkansas Video's customer relations management software—called PipeDrive—which made it more difficult for him to meet his minimum sales quota.[11]   On April 16, 2021, Mr. Harris filed the instant lawsuit, asserting a host of claims, including discrimination and retaliation claims.[12]   On June 9, 2022, Mr. Harris amended his Complaint, adding a constructive discharge claim.[13]

Pending before the Court is Defendants' Motion for Summary Judgment.[14]   Following a hearing on the Motion, the Court—with the agreement of Mr. Harris—granted summary judgment to Defendants on all claims except for the following: (1) race discrimination, retaliation, and constructive discharge claims against East Arkansas Video and WEHCO Video under Title VII, § 1981, and ACRA, and (2) race discrimination, retaliation, and constructive discharge claims against Lori Haight, Don Deem, Charlotte Dial, and Paul Morbeck under § 1981.[15]   Shortly thereafter, the Court stayed the case and delayed a summary judgment ruling on the remaining claims in anticipation of the Supreme Court's decision in *Muldrow v. City of St. Louis*.[16]

---

[10] Ex. 13 (Jan. 4, 2021 EEOC Charge) to Defs.' Mot. for Summ. J. (Doc. 67-13).

[11] *Id.*

[12] Compl. (Doc. 1).

[13] Second Am. Compl. (Doc. 47) ¶¶ 65–67.

[14] Defs.' Mot. for Summ. J. (Doc. 67).

[15] Oct. 24, 2023 Order (Doc. 87); Oct. 23, 2023 Hr'g Tr. (Rough) at 12:10:20–12:11:46, 12:14:30–12:16:02, 13:21:55–13:22:57.

[16] Jan. 5, 2024 Order (Doc. 88).

*Muldrow* has since been decided, and the Court thus lifted the stay.[17]   This Motion is now ready for final resolution.   For the reasons described below, the Court GRANTS Defendants' Motion for Summary Judgment.[18]

## I. BACKGROUND FACTS

On summary judgment, the Court is supposed to consider the record in a very particular way.   First, the Court adopts and considers all undisputed facts.[19]   Second, as to each genuinely disputed fact that is material to the outcome of the case, the Court adopts and considers the version of the fact that is most favorable to the non-moving party.[20]   (A fact is genuinely disputed if a reasonable jury could decide the fact in favor of either Plaintiff or Defendants.[21])   From all the facts discussed above, the Court then draws all reasonable inferences that are most favorable to the non-moving party.[22]   All this is to say that the story presented below is the most Plaintiff-friendly rendition of the facts that a reasonable jury could conclude occurred.

East Arkansas Video is a cable television and internet service provider.[23]   Starting in 2012, Mr. Harris worked for the company as a sales representative.[24]   At that time, and for much of his tenure at the company, Mr. Harris earned the entirety of his pay through commissions.[25]   He had

---

[17] 601 U.S. 346 (2024); July 24, 2024 Order (Doc. 89).

[18] Defs' Mot. for Summ. J. (Doc. 67).

[19] *See Erickson v. Nationstar Mortg., LLC*, 31 F.4th 1044, 1047–48 (8th Cir. 2022).

[20] *See Quinn v. St. Louis Cnty.*, 653 F.3d 745, 750 (8th Cir. 2011).

[21] *See Morrow v. United States*, 47 F.4th 700, 704 (8th Cir. 2022).

[22] *See Quinn*, 653 F.3d at 750.

[23] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 4.

[24] *Id.* ¶¶ 2, 9.

[25] *Id.* ¶ 10.

no required hours and could work as much or as little as he desired.[26]   This position had no minimum sales requirement.[27]

From 2018 to 2020, the company's parent (WEHCO Video) hired 13 business class sales representatives—eight were white, three were Black, and two were Hispanic or Latino.[28]   The new business class sales representatives received a greater commission on sales than Mr. Harris had been receiving.[29]   They also got a base salary of $400 per pay period plus a $125 per month transportation expense stipend.[30]   These new business class sales representatives also had a bi-weekly minimum sales requirement.[31]   If they failed to meet this requirement, they could face termination.[32]

From 2012 through the end of 2019, Mr. Harris remained in his non-salaried-commission-only role.[33]   Then, in February of 2020, Ms. Haight (WEHCO Video's Vice President of Marketing and Client Care) told Mr. Harris that his non-salaried-commission-only position was being eliminated.[34]   Subsequently, Don Deem (WEHCO Video's Sales Manager) met with Mr. Harris and informed him that, should he wish to continue his employment with East Arkansas

---

[26] *Id.* ¶ 11.

[27] *Id.* ¶ 10.

[28] *Id.* ¶¶ 6–7, 14.

[29] *See id.* ¶ 17; Harris Dep. (Doc. 90) at 105.

[30] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 17; Harris Dep. (Doc. 90) at 92; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 11–13.   *See also* Oct. 23, 2023 Hr'g Tr. (Rough) at 13:23:29–13:26:30; 13:32:32–13:33:54.   There is a discrepancy in the record as to whether the base salary was around $10,000 per year or $12,000 per year.   That discrepancy is not material to any issues the Court needs to decide in this Order.

[31] Ex. 6 (Business Class Representative Performance Policy) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-6).

[32] *Id.*

[33] *See* Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 9–10, 15.

[34] Harris Dep. (Doc. 90) at 107–08; Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 5, 15.

Video, Mr. Harris would need to transition to a business class sales representative position with a salary and minimum sales quota.[35]   Mr. Harris agreed to the transition in March of 2020.[36]

Before Mr. Harris could be transitioned over to a salaried position, Paul Morbeck (WEHCO Video's President) objected to Mr. Harris's transition on the grounds that Mr. Harris wouldn't "produce sufficiently to justify that payment."[37]   Between 2012 and 2019, Mr. Harris's commission earnings were as follows: $1,006 (2012), $4,769 (2013), $6,807 (2014), $5,120 (2015), $2,370 (2016), $5,265 (2017), $4,515 (2018), and $3,290 (2019).[38]   This record evidence does not tell us exactly how much Mr. Harris sold because the record does not reveal exactly how commissions were calculated.   But the record evidence does lend some credibility to Mr. Morbeck's assertion of low sales on the part of Mr. Harris.   In any event, there is agreement between the parties that, in order to meet the minimum sales quota for the salaried position, Mr. Harris would need to increase his sales.[39]

Eventually, after some prodding from Mr. Deem and Ms. Haight, Mr. Morbeck agreed to transfer Mr. Harris to the business class sales representative position; but Mr. Morbeck placed Mr. Harris on probationary conditions.[40]   During this probationary term, Mr. Harris would receive the higher commission rate associated with the business class sales representative position, but he would not immediately receive the salary and transportation expense stipends.[41]   If, at the end of

---

[35] Harris Dep. (Doc. 90) at 92–93; Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 5, 16.

[36] Harris Dep. (Doc. 90) at 110.

[37] Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 5, 21.

[38] *Id.* ¶ 22.

[39] *Id.* ¶ 23

[40] *Id.* ¶ 24; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 35–39; Ex. 3 (Morbeck Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-3) at 22–27; Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 26–28; Oct. 23, 2023 Hr'g Tr. (Rough) at 13:28:57–13:29:39.

[41] Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 24, 26, 29–31.

the probationary period, Mr. Harris had consistently met specific sales metrics, he would receive the salary and the transportation expense stipend (in addition to commissions) going forward.[42] Mr. Harris would also receive a disbursement to make up for the salary and expense stipend that he did not receive while on probation.[43]   In order to successfully complete probation, Mr. Harris needed to meet his minimum sales quota in 10 out of 14 pay periods.[44]   Mr. Harris agreed to this scheme and proceeded to work in his new role.[45]

In late May or early June of 2020, Mr. Harris met with Mr. Deem so that Mr. Harris could pick up a laptop and phone in preparation for his transition to the new position.[46]   At that meeting, Mr. Deem told Mr. Harris that Mr. Harris would be getting set up with a PipeDrive profile.[47] PipeDrive is a customer relations management tool.[48]   The software sorts the data of potential customers and helps salespeople search, sort, and qualify leads.[49]   For example, PipeDrive had information regarding when potential customers' contracts expired with other service providers.[50] Salespeople could use this information to decide which potential customers to pitch WEHCO Video's services.[51]   If a salesperson lacked access to PipeDrive, that could negatively affect his or her sales numbers.[52]

---

[42] *Id.* ¶¶ 24, 26, 31.

[43] *Id.*

[44] *Id.* ¶ 26.

[45] *Id.* ¶ 27.

[46] Harris Dep. (Doc. 90) at 88–92.   COVID prevented an earlier meeting.   *See id.* at 109–10.

[47] *Id.* at 112.

[48] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 44.

[49] Ex. 1 (Harris Decl.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-1) ¶¶ 3–4.

[50] *Id.* ¶ 3.

[51] *See id.*

[52] *See id.* ¶ 2.

During this late May/early June 2020 meeting, Mr. Harris asked Mr. Deem why Mr. Harris wasn't getting the same pay as the other salespeople.[53]   (This appears to refer to Mr. Harris's probationary conditions regarding pay.)   Mr. Harris also asked Mr. Deem whether Mr. Harris was the only Black salesperson.[54]   Mr. Deem became visibly upset and commented that "black people tend to play the race card."[55]   Mr. Deem further said that this was "why he didn't like to hire blacks."[56]

On June 12, 2020, Mr. Harris received his first paycheck while on probation.[57]   This paycheck did not include a salary payment or a travel expense stipend.[58]   That day, Mr. Harris emailed Mr. Deem's assistant, copying Mr. Deem and others, to complain that his "pay seem[ed] woefully short."[59]   Mr. Deem responded, explaining that Mr. Harris's new (higher) commission rate would start the next pay period.[60]   But—unknown to Mr. Deem—Mr. Harris was focused not just on the commission rate.   He was focused more broadly on overall pay, including the salary and travel expense stipend.[61]   Mr. Harris was not satisfied with Mr. Deem's answer and asserted,

---

[53] Harris Dep. (Doc. 90) at 89.

[54] *Id.*

[55] *Id.*

[56] *Id.* at 88–89.   It should be noted that Mr. Deem vehemently denies that he made the above statements.   Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 31–32.   But, because the Court must, for summary judgment purposes, view the evidence in the light most favorable to the non-moving party, the Court must treat Mr. Harris's testimonial assertions as true.

[57] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 28.

[58] *See* Harris Dep. (Doc. 90) at 123–24.

[59] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 15.

[60] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 29.

[61] *See* Harris Dep. (Doc. 90) at 123–24; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 14.

in a response email, that Mr. Harris should be "paid equally to the other [salaried employees] for [his] work . . . ."[62]   Mr. Harris added that the situation was "starting to seem like a racial issue."[63]

Mr. Deem once again assured Mr. Harris that the increased commission rate would go into effect for the pay period ending on June 18, 2020.[64]   Mr. Harris then responded more directly on the commission issue, asserting that he was told, during the February 2020 meeting, that the increased commission rate would begin on April 1, 2020.[65]   In a further responsive email, Mr. Deem vehemently denied saying any such thing during the meeting.[66]   Mr. Harris then responded that he wished to file a grievance.[67]   Ms. Haight (who was one of the people copied on this email chain) provided Mr. Harris with the grievance policy and encouraged him to file a grievance.[68]   Mr. Harris then reiterated that he was being paid less than other employees in that he was being paid a "pittance compared to others doing the same job" and not receiving "base pay" or "car expenses."[69]

Later that afternoon, Mr. Morbeck (who was also copied on this email chain) sent a responsive email, explaining to Mr. Harris why he was put on probation and what he would have to do to successfully complete probation.[70]   Mr. Morbeck then told Mr. Harris that "the tenor of this message thread, including the veiled accusation of racism, should not be repeated."[71]

---

[62] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 15.

[63] *Id.*

[64] *Id.*

[65] *Id.* at 14–15.

[66] *Id.* at 14.

[67] *Id.*

[68] *Id.*

[69] *Id.*

[70] Ex. 8 (Morbeck Email) to Defs.' Mot. for Summ. J. (Doc. 67-8).

[71] *Id.*

Around this same time—June 2020—Mr. Harris met with Branden Hornbeck (Mr. Deem's assistant) to set up his company issued laptop for his new position.[72]   At the meeting, Mr. Hornbeck told Mr. Harris that Mr. Deem would set up Mr. Harris's PipeDrive profile.[73] Mr. Hornbeck then got on a sales call with Mr. Deem and the other salespeople and mentioned to Mr. Deem that Mr. Harris needed to be set up with a PipeDrive profile.[74]   Mr. Deem agreed, and Mr. Hornbeck assured Mr. Harris that Mr. Deem would work to get Mr. Harris's PipeDrive profile set up.[75]   Apparently, however, the profile was not set up.[76]   Several weeks later, Mr. Harris followed up twice with Mr. Deem to try to set up a PipeDrive profile, but both times Mr. Deem was unable to assist at the moment.[77]   Mr. Deem did mention that Mr. Harris should have received an invitation to create a PipeDrive profile.[78]   But Mr. Harris received no such invitation.[79] Bottom line: Mr. Harris was not able to access PipeDrive at that time.[80]

On July 21, 2020, Mr. Deem emailed Mr. Harris asking to meet with Mr. Harris to discuss Mr. Harris's failure to reach the minimum sales quota for the previous two pay periods.[81]   The meeting was held on July 23, 2020.[82]   At the meeting, Mr. Deem suggested a series of steps that Mr. Harris could take to help him reach his minimum sales quota.[83]   One of those steps included

---

[72] Harris Dep. (Doc. 90) at 92, 114.

[73] *Id.* at 114.

[74] *Id.*

[75] *Id.*

[76] *Id.*

[77] *Id.* at 114–16.

[78] *Id.* at 116.

[79] *Id.* at 116–17.

[80] *Id.* at 114–17, 146.

[81] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 9.

[82] *Id.* at 7–9.

[83] *Id.* at 7.

setting up a PipeDrive profile.[84]   Mr. Deem said that he re-sent a PipeDrive invitation to Mr. Harris's email address.[85]   Mr. Harris never received it.[86]

On August 4, 2020, Mr. Harris filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").[87]   The Charge alleges that Mr. Harris was being paid less than his white counterparts.[88]   Two days later, Mr. Deem emailed Mr. Harris to notify him that Mr. Harris had once again missed his required sales minimum.[89]

In October 2020, Mr. Deem reached out to several salespeople, including Mr. Harris, asking them to update PipeDrive daily.[90]   Mr. Harris had still not created a PipeDrive profile, so Mr. Deem asked Mr. Harris to create a profile.[91]   Mr. Deem then sent Mr. Harris another invitation to create a PipeDrive profile, but Mr. Harris did not receive the invitation.[92]   Over the next four days, Mr. Deem sent Mr. Harris a series of invitations, but still Mr. Harris did not receive an invitation.[93]   Mr. Deem even contacted PipeDrive, asking for help with Mr. Harris's invitation.[94]

It appears that Mr. Deem was sending the invitations to the wrong email address.   The emails were seemingly sent to harrisjbharris@wehco.com when the emails should have been sent

---

[84] *Id.*

[85] *Id.*

[86] Harris Dep. (Doc. 90) at 137.

[87] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 38; Ex. 10 (Aug. 4, 2020 EEOC Charge) to Defs.' Mot. for Summ. J. (Doc. 67-10).

[88] Ex. 10 (Aug. 4, 2020 EEOC Charge) to Defs.' Mot. for Summ. J. (Doc. 67-10).

[89] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 37; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 32.   It should be noted that Mr. Harris asserts that his failure to meet the sales quota during this period was due to a back injury he sustained in early June 2020.   Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 23; Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 37.

[90] Ex. 7 (Part 2 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-7) at 30.

[91] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 46.

[92] Ex. 7 (Part 2 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-7) at 5–6.

[93] *Id.* at 1–6.

[94] *Id.* at 57–58.

to jbharris@wehco.com.[95]   That latter email address is Mr. Harris's correct work email.[96]   The former email address is not a correct address for Mr. Harris at all.

At one point during Mr. Harris's email conversations with Mr. Deem, Mr. Harris asked Mr. Deem whether the invitations were being sent to his work email.[97]   Mr. Harris also indirectly drew attention to the potentially incorrect harrisjbharris@wehco.com email address, asking if that was supposed to be his username for the PipeDrive profile.[98]   But Mr. Harris never explicitly pointed out that it appeared that Mr. Deem was sending invitations to the wrong email address. Mr. Deem followed up with Mr. Harris on November 5, 2020, asking whether Mr. Harris ever received an invitation for PipeDrive.[99]   Mr. Harris responded, telling Mr. Deem that, after checking his inbox and spam folder, he was unable to find a PipeDrive invitation.[100]   On January 21, 2021, Mr. Harris told Charlotte Dial (WEHCO Video's Vice President of Administration) that he was not able to access PipeDrive.[101]   Still, nothing changed.   There is no evidence as to what Ms. Dial did or did not do in response to learning about Mr. Harris's inability to access PipeDrive.

Other salespeople at WEHCO Video also had trouble accessing PipeDrive, but they were all eventually able to create a PipeDrive profile.[102]   In contrast, Mr. Harris was never able to

---

[95] *See id.* at 3, 57–58.   *But see id.* at 5; Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 37.

[96] *See* Ex. 7 (Part 2 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-7) at 1.

[97] *Id.* at 17.

[98] *Id.*

[99] Ex. 4 (PipeDrive Emails) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-4) at 1.

[100] *Id.*

[101] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 47–48; *see also* Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 5.

[102] Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 38–39.

access PipeDrive.[103]   Mr. Harris was the only salesperson to never have access to PipeDrive during his entire tenure as a business class sales representative.[104]

On January 4, 2021, Mr. Harris filed an Amended Charge of Discrimination with the EEOC.[105]   In the Amended Charge, Mr. Harris alleged, in addition to the allegations in the August 4, 2020 Charge, that he was being denied access to PipeDrive both on account of his race and in retaliation for his previous EEOC Charge.[106]

On January 12, 2021, Ms. Dial informed Mr. Harris that he did not successfully complete probation.[107]   As a result, WEHCO Video would not pay Mr. Harris the salary or travel expense stipend.[108]   Instead, Ms. Dial offered Mr. Harris the opportunity to do another probationary term.[109]   The new probationary term would have the same conditions as the original one.[110]   A little over a week later, Mr. Harris responded with several reasons why he was unable to meet his minimum sales requirements.[111]   Those reasons included the following: (1) Mr. Harris's contact list was made up almost entirely of corporate accounts, which are more difficult to sell; (2) the pay periods that Mr. Harris missed his minimum sales requirement were during the holidays and deer season, times when corporate decision makers are out of the office; (3) Mr. Harris was not provided

---

[103] Harris Dep. (Doc. 90) at 135, 147; Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 38–39.

[104] Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 38–39.

[105] Ex. 13 (Jan. 4, 2021 EEOC Charge) to Defs.' Mot. for Summ. J. (Doc. 67-13).

[106] *Id.*

[107] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 43.

[108] *See id.*

[109] *Id.*

[110] *Id.*   Mr. Harris would need to meet his minimum sales requirement in 10 of the next 14 pay periods to successfully complete the probation program.   *Id.*   If Mr. Harris was successful, he would receive a salary, travel expense stipend payments, and a disbursement to cover the salary and travel expense stipend payments that he did not receive while on probation.   *Id.*

[111] *Id.* at 47–48.

access to PipeDrive; (4) Mr. Harris was dealing with medical issues during many of the pay periods where he failed to meet the minimum sales quota; and (5) Mr. Harris was not able to maintain his vehicle because he was not receiving the travel expense stipend.[112]   Mr. Harris concluded by opining that it seemed like he was set up to fail.[113]

On April 16, 2021, Mr. Harris filed the instant lawsuit.[114]   On August 11, 2021, Mr. Harris resigned from his position at East Arkansas Video.[115]   Mr. Harris became convinced that he was not going to be able to meet his sales quota without access to PipeDrive.[116]   As such, he believed he would never be able to receive a salary or travel expense stipend payments—either retroactively or prospectively.   Ultimately, Mr. Harris concluded that he could no longer continue to work under conditions that he described as "discriminatory and retaliatory."[117]

## II.  LEGAL ANALYSIS

Mr. Harris brings race discrimination, retaliation, and constructive discharge claims against WEHCO Video and East Arkansas Video under Title VII, § 1981, and ACRA.[118]   Mr. Harris also brings race discrimination, retaliation, and constructive discharge claims against Ms. Haight, Mr. Deem, Ms. Dial, and Mr. Morbeck under § 1981.[119]   Race discrimination, retaliation, and constructive discharge claims brought under Title VII, § 1981, and ACRA are all analyzed in the same manner.[120]   And, in the circumstances presented by this case, there is no daylight between

---

[112] *Id.*

[113] *Id.* at 48.

[114] Compl. (Doc. 1).

[115] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 2; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 20.

[116] Harris Dep. (Doc. 90) at 163.

[117] Ex. 1 (Harris Decl.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-1) ¶ 13.

[118] *See generally* Second Am. Compl. (Doc. 47).

[119] *See id.*; *see also* Oct. 24, 2023 Order (Doc. 87).

[120] *See Merritt v. Albemarle Corp.*, 496 F.3d 880, 883 (8th Cir. 2007); *Kim v. Nash Finch Co.*, 123 F.3d 1046, 1063

how the claims against the employer Defendants are analyzed and how the claims against the individual Defendants are analyzed.   They all rise and fall together.[121]

The parties agree (or at least Mr. Harris does not dispute) that the *McDonnell-Douglas* burden-shifting framework applies to the claims in this case.[122]   The *McDonnell-Douglas* framework applies when there is no direct evidence of discrimination or retaliation.[123]   Under this framework, Mr. Harris must, for each claim, provide evidence that could lead a rational jury to conclude that he has established a prima facie case of discrimination or retaliation.[124]   If he does, Defendants must point to a lawful, non-discriminatory, non-retaliatory reason for why the challenged action was taken.[125]   If Defendants produce such a justification, Mr. Harris must provide evidence that could lead a rational jury to conclude that Defendants' proffered justification for the challenged action is pretext for discrimination or retaliation.[126]

Before diving into the *McDonnell-Douglas* analysis, it is important to correctly understand the substance of the claims that are still live in this case.   First, Mr. Harris believes that his placement on probationary conditions (and thus not paid a salary or travel expense stipend)

---

(8th Cir. 1997); *Tidwell v. Meyer's Bakeries, Inc.*, 93 F.3d 490, 494 (8th Cir. 1996).

[121] Mr. Harris does not argue—in his briefing or elsewhere—that this is a situation where a supervisor Defendant could be liable under § 1981 even if the employer Defendants are not liable under Title VII, ACRA, and § 1981.

[122] Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 68) at 14–16; Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 6–15.   *See also Carpenter v. Con-Way Cent. Express, Inc.*, 481 F.3d 611, 616 (8th Cir. 2007); *Kratzer v. Rockwell Collins, Inc.*, 398 F.3d 1040, 1048 (8th Cir. 2005); *Erenberg v. Methodist Hosp.*, 357 F.3d 787, 792 (8th Cir. 2004); *Kim*, 123 F.3d at 1056.

[123] *Kratzer*, 398 F.3d at 1045–46.   The closest Mr. Harris comes to direct evidence are the statements made by Mr. Deem at the late May/early June meeting between him and Mr. Harris.   *See supra* page 7.   But even those statements do not actually rise to the level of direct evidence.   And Mr. Harris appears to agree, since he also exclusively uses the *McDonnell-Douglas* test to argue his case.   *See* Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 6–15.

[124] *See Kratzer*, 398 F.3d at 1046.

[125] *See id.*

[126] *See Naguib v. Trimark Hotel Corp.*, 903 F.3d 806, 811 (8th Cir. 2018).   *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 515–16 (1993) ("[A] reason cannot be proved to be a 'pretext *for discrimination*' unless it is shown *both* that the reason was false, *and* that discrimination was the real reason.").

constituted racial discrimination.[127]   Second, Mr. Harris believes that the denial of access to PipeDrive constituted racial discrimination and retaliation.[128]   Third, Mr. Harris believes that he was constructively discharged from his job and this constituted racial discrimination and retaliation.[129]   The Court addresses each bucket of claims below.

### A.   Constructive Discharge Claims

Defendants are entitled to summary judgment on the constructive discharge claims because, *inter alia*, Mr. Harris has provided no evidence from which a reasonable jury could conclude that "a reasonable person in his situation would find the working conditions intolerable."[130]   Working conditions are intolerable if a reasonable person in Mr. Harris's position would have deemed resignation the only plausible alternative.[131]   Mr. Harris points to three different conditions that lead to his decision to resign: (1) the denial of a salary and travel expense stipend; (2) his inability to access PipeDrive and the consequent likelihood that he would not be able to meet his minimum sales quota; and (3) the stresses of being discriminated and retaliated against at work, which aggravated his heart disease.[132]   None of these conditions—on their own or in combination—are enough to create an intolerable working environment.

In the best precedential case for Mr. Harris, the Eighth Circuit has suggested that, if a better qualified employee "is repeatedly turned down for promotions in favor of inferior candidates, . . .

---

[127] *See* Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 8–11.

[128] *Id.* at 6–8, 11–14.

[129] *Id.* at 14–15.

[130] *Carpenter*, 481 F.3d at 616.

[131] *See Williams v. City of Kansas City*, 223 F.3d 749, 753–54 (8th Cir. 2000).

[132] Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 14–15; Ex. 1 (Harris Decl.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-1) ¶¶ 9–13.   The lack of access to PipeDrive and other adverse conditions could have also affected Mr. Harris's commission-based pay.   *See* Ex. 1 (Harris Decl.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-1) ¶¶ 2–6.   But Mr. Harris does not state that a reduction in commission-based pay caused him to quit.   Instead, Mr. Harris emphasizes that he quit because the lack of access to PipeDrive made it difficult for him to meet the minimum sales quota.   *See* Harris Dep. (Doc. 90) at 163.

a negative and degrading atmosphere sufficient to constitute constructive discharge might exist."[133]   That is not the case here.   Mr. Harris worked for East Arkansas Video for years without being paid a salary or a travel expense stipend.[134]   In 2020, Mr. Harris was not demoted and his pay was not reduced.[135]   Rather, Mr. Harris's commission rate was increased, and he was given the opportunity to earn a salary and travel expense stipend.[136]   And if Mr. Harris was able to meet the sales quotas, he would have received a disbursement to make up for the salary and expense stipend payments that he did not receive while on probation.[137]   Moreover, when Mr. Harris was unable to successfully complete the first probationary term, he was given another opportunity to earn a salary and expense stipend.[138]

Mr. Harris may have been frustrated that he was forced to jump through hoops to receive all the benefits of his transfer, but such "frustration . . . do[es] not make work conditions sufficiently intolerable to constitute constructive discharge."[139]   The mere fact that Mr. Harris was not receiving a salary or travel expense stipend—as was the case prior to February of 2020—did not constitute an intolerable working condition.   Nor did Mr. Harris's inability to access PipeDrive.   For certain, lack of access to PipeDrive made Mr. Harris's job harder than it had to

---

[133] *Tidwell*, 93 F.3d at 495.

[134] *See* Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 2, 10.

[135] *Cf. Sanders v. Lee Cnty. Sch. Dist. No. 1*, 669 F.3d 888, 894 (8th Cir. 2012) ("We have previously recognized a plaintiff may support a constructive discharge claim with evidence that [he] was assigned to a new position which 'a reasonable employee in [his] position would find demeaning and intolerable.'" (quoting *Parrish v. Immanuel Med. Ctr.*, 92 .3d 727. 732 (8th Cir. 1996))).

[136] Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 17, 24, 26, 31; Ex. 8 (Morbeck Email) to Defs.' Mot. for Summ. J. (Doc. 67-8).

[137] Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 24, 26, 31; Ex. 8 (Morbeck Email) to Defs.' Mot. for Summ. J. (Doc. 67-8).

[138] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 43.

[139] *West v. Marion Merrell Dow, Inc.*, 54 F.3d 493, 498 (8th Cir. 1995).

be.[140]   But harder is not intolerable.   Mr. Harris had been working at East Arkansas Video as a salesman for years without PipeDrive.   It would be nonsensical to suggest that lack of access to a job aid he had never used before rises to the level of intolerability.

Finally, the stressors associated with being discriminated and retaliated against do not create intolerable working conditions unless the discrimination is so bad as to create a hostile working environment.[141]   There is no question that believing that you are being discriminated or retaliated against can be stressful.   But, in the Eighth Circuit, this stress is insufficient to support a constructive discharge claim unless the discrimination or retaliation is severe.[142]   Mr. Harris having heart disease does not alter that general rule.

There is no evidence that Mr. Harris informed the Defendants of his heart disease.   Nor is there any evidence that Defendants forced Mr. Harris to engage in strenuous physical or emotional activity.   On the contrary, Mr. Harris's job gave him extreme flexibility.[143]   To be sure, heart disease is a scary condition.   It should be taken seriously, and Mr. Harris very well may have needed to quit his job at East Arkansas Video for the sake of his own health.   But if that were the case, Mr. Harris's resignation would have been caused by his own health conditions, not by intolerable work conditions.

---

[140] *See* Ex. 1 (Harris Decl.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-1) ¶¶ 2–6.

[141] *See Klein v. McGowan*, 198 F.3d 705, 709 (8th Cir. 1999) ("Constructive discharge occurs when an employer deliberately renders the employee's working conditions intolerable and this forces him to quit his job.   The conduct complained of must have been severe or pervasive enough to create an objectively hostile or abusive work environment." (citation omitted)).   *Cf. Pa. State Police v. Suders*, 542 U.S. 129, 146–49 (2004) ("The constructive discharge here at issue stems from, and can be regarded as an aggravated case of, . . . hostile work environment.").

[142] *See O'Brien v. Dep't of Agric.*, 532 F.3d 805, 809 (8th Cir. 2008).

[143] *See* Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 11; Ex. 3 (Morbeck Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-3) at 23–24, 29–30.

The severity of wrongful conduct necessary to make out a constructive discharge claim is akin to the severity of wrongful conduct needed for a hostile work environment claim.[144]   And there is no serious argument that the purported wrongful conduct in this comes anywhere close to the Eighth Circuit's high standard for a hostile work environment.[145]   A hostile work environment is one where "the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."[146]   Only one incident could even arguably merit further discussion given this definition.   In the late May or early June 2020 meeting with Mr. Deem, after Mr. Harris asked whether he was the only Black salesperson, Mr. Deem stated that Black people "tend to play the race card" and that "he didn't like to hire blacks."[147]   This is certainly an offensive and insulting comment.[148]   But it was only one incident.   And, without unusual circumstances not presented here, "[a]llegations of a few isolated or sporadic incidents will not suffice" to make out a hostile work environment.[149]

In summary, none of the conditions detailed above, nor all of them together, constitute intolerable working conditions.   So, all of Mr. Harris's constructive discharge claims fail.   No reasonable jury could conclude otherwise.

---

[144] *See Suders*, 542 U.S. at 149 ("Creation of a hostile work environment is a necessary predicate to a hostile-environment constructive discharge case.").

[145] *See Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518–19 (8th Cir. 2010).

[146] *Gordon v. Shafer Contracting Co., Inc.*, 469 F.3d 1191, 1194 (8th Cir. 2006) (quoting *Palesch v. Mo. Comm'n on Human Rights*, 233 F.3d 560, 566 (8th Cir. 2000) (quotation marks omitted)).

[147] Harris Dep. (Doc. 90) at 87–92.

[148] The Court reminds readers, because we are at summary judgment, the Court must assume Mr. Deem made these statements despite Mr. Deem's denial of making these statements.   *See* Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 31–32.

[149] *Nitsche v. CEO of Osage Valley Elec. Coop.*, 446 F.3d 841, 846 (8th Cir. 2006).

## B.      Race Discrimination Claims

The Court assumes—without deciding—that Mr. Harris has made out a prima facie case of race discrimination with respect to (1) his placement on probationary conditions (and thus nonpayment of a salary or travel expense stipend); and (2) the denial of access to PipeDrive.[150] Even under this assumption, Defendants are entitled to summary judgment.   They have provided legitimate, non-discriminatory justifications for the challenged actions.   And there is no evidence in the record that could lead a reasonable jury to find that Mr. Harris has proved the justifications to be pretext for discrimination.

### 1.      Probationary Pay Issues

Defendants say that the reason Mr. Harris was put on probationary conditions in the new position to which he was transferred—and thus not immediately given a salary and travel expense stipend—was his years-long track record of low sales.[151]   That is undoubtedly a legitimate, non-discriminatory reason for the challenged action.   So, we ask whether Mr. Harris has provided evidence that this proffered justification is pretext for discrimination.

Mr. Harris first suggests that there is evidence of similarly situated non-Black employees being treated differently.[152]   Specifically, he says that none of the white business class sales representatives were put on probation or denied a salary and travel expense stipend.[153]   The

---

[150] Among several other fights at the prima facie stage, the parties contest whether Mr. Harris's lack of access to PipeDrive constituted adverse action.   *See* Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 68) at 15; Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 7–8.   Although it is not entirely clear, the better view post-*Muldrow* is that it did.   Here's why.   During the probationary period, Mr. Harris was paid entirely via commissions.   *See* Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 31.   The record contains sufficient evidence to suggest that access to PipeDrive helped to increase sales figures.   Ex. 1 (Harris Decl.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-1) ¶¶ 2–6.   As such, not having access to PipeDrive likely had real monetary consequences for Mr. Harris.   Those consequences are likely sufficient to constitute adverse action under *Muldrow*.   *See* 601 U.S. at 355–56.

[151] Br. in Supp. of Defs.' Mot. for Summ. J. (Doc. 68) at 19–21; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 35–36.

[152] Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 10–11.

[153] *Id.*

problem with this argument is that there is an important (and very relevant) distinction between those other employees and Mr. Harris.   And that distinction means those employees are not really similarly situated to Mr. Harris, at least not for purposes of this third step in the *McDonnell-Douglas* analysis.[154]

Now, what is that distinction?   For all the other employees—whether we are talking about new hires or transfers—there is no evidence of a years-long track record of low sales before entering the new position.   For Mr. Harris, there is such a record and there is evidence that Mr. Morbeck (the decisionmaker in this instance) knew of that record.[155]   This distinction explains the differential treatment such that no reasonable jury would consider the differential treatment to be evidence of pretext for discrimination.

That is all the more true because there is evidence that the 13 other salespeople—who did get a salary and travel expense stipend—included three Black employees and two Hispanic or Latino employees.[156]   If racial discrimination were the reason for Mr. Harris being given a probationary period (with the resulting pay consequences), why would this have only happened to Mr. Harris?   Similarly, consider that, when Mr. Harris failed to meet his sales quota during his first probationary period, Defendants did not fire Mr. Harris.[157]   Instead, they set up a new probationary period to give him another chance to succeed.[158]   That does not square with the purported racial bias of Defendants.

---

[154] *See Wimbley v. Cashion*, 588 F.3d 959, 962 (8th Cir. 2009) (explaining that, when analyzing the third step of the *McDonnell-Douglas* test, "the test for determining whether [a comparator] is similarly situated to [the plaintiff] is rigorous").

[155] Resp. to Statement of Undisputed Facts (Doc. 76) ¶¶ 21–22; Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 35–36, 39.

[156] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 7; Ex. 2 (Pl.'s Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-2) at 4.

[157] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 43.

[158] *Id.*

Mr. Harris notes that Mr. Morbeck did not want to give him the new position at all, and only did so upon the urging of Mr. Deem and Ms. Haight.[159]   Mr. Harris suggests this is evidence of race discrimination.   But it is unclear why.   There is evidence of Mr. Morbeck approving the hiring of other Black salespeople into the business class sales representative position.[160]   The mere fact that Mr. Morbeck disagreed with his middle managers about Mr. Harris's potential for success—given Mr. Harris's track record of low sales—is of little note.   And, of course, Mr. Morbeck ultimately relented and gave Mr. Harris a chance despite Mr. Morbeck's concerns.[161] That's seems a far cry from racially discriminatory conduct.

On this record, no reasonable jury could conclude that Mr. Harris has proven that Defendants' proffered justification for the probationary period (and resulting pay issues) is pretext for race discrimination.[162]

---

[159] *Id.* at 35–39; Ex. 3 (Morbeck Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-3) at 22–27; Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 26–28; Oct. 23, 2023 Hr'g Tr. (Rough) at 13:28:57–13:29:39.

[160] Ex. 3 (Morbeck Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-3) at 13; Ex. 2 (Pl.'s Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-2) at 4.

[161] Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 35–36.

[162] Mr. Harris's other pretext-for-discrimination arguments are even less compelling.   For example, Mr. Harris argues that a jury could infer discrimination from the "hostile reaction" Mr. Morbeck had to Mr. Harris's June 2020 email complaining about pay and raising the specter of racial discrimination.   *See* Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 10.   But no reasonable jury could find Mr. Morbeck's reaction "hostile."   After explaining why Mr. Harris had been placed on probation, Mr. Morbeck concluded his email as follows:

> It's all entirely up to you.   You have the chance to show us that you are willing to do the work that is required.   And, if turns out that you don't make it – then – that's on you too.
>
> From this point forward, however, I suggest that you refrain from sending your emails to an audience of additional, uninvolved, recipients.   I[f] you have a problem with your supervisor – deal with him, and then if you think it is necessary to do so – deal with his supervisor.   If you want to submit a grievance (you have a copy of that policy) – send it to Charlotte.   If you want to email me – feel free to do so.   But the tenor of this message thread, including the veiled accusation of racism, should not be repeated.   This has nothing to do with your race; it has everything to do with your personal performance.   It is up to you to show the company what you can do / what you will do / in that regard.

Ex. 8 (Morbeck Email) to Defs.' Mot. for Summ. J. (Doc. 67-8).   The email reads like it is from a sender who disagrees with the recipient's suggestion of racism.   Nothing more, nothing less.   No reasonable jury could infer a racially discriminatory motive from this denial of a racially discriminatory motive.

## 2.      Lack of PipeDrive Access

Defendants say they failed to give Mr. Harris access to PipeDrive because they mistakenly sent the PipeDrive invitation to the wrong email address.[163]   This is a legitimate, non-discriminatory reason for failing to give Mr. Harris access to PipeDrive.   So, again, we ask whether Mr. Harris has submitted evidence that this proffered justification is pretext for discrimination.

Mr. Harris admits that the invitations were sent to the wrong email address.[164]   But he implies that Mr. Deem intentionally sent the emails to the wrong email address.[165]   As evidence for his assertion, Mr. Harris points to emails where he asked Mr. Deem whether the invitations were being sent to his work email address and whether harrisjbharris@wehco.com (the incorrect email address) was his profile username.[166]   After these emails, Mr. Deem apparently continued to send the invitations to the incorrect email address.[167]

This evidence is insufficient to show pretext for discrimination.   Mr. Harris never directly told Mr. Deem that he was using the wrong email address.   There is no evidence that Mr. Deem knew he was doing so.   It was Mr. Deem that initially asked Mr. Harris to create a PipeDrive profile.[168]   Why would he do so if he was trying to prevent Mr. Harris's access to PipeDrive? When Mr. Harris was unable to create a profile, it was Mr. Deem that communicated with

---

[163] *See* Reply in Supp. of Defs.' Mot. for Summ. J. (Doc. 83) at 3, 6; Oct. 23, 2023 Hr'g Tr. (Rough) at 12:34:15– 12:37:54; Ex. 7 (Part 2 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-7) at 3, 57–58.

[164] Resp. to Statement of Undisputed Facts (Doc. 76) ¶ 47.

[165] Harris Dep. (Doc. 90) at 162; Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 6–7.

[166] *See* Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 7; Ex. 7 (Part 2 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-7) at 17.

[167] Ex. 7 (Part 2 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-7) at 13, 57–58.

[168] *Id.* at 29–30.

22

Mr. Harris over a series of emails to try to solve the problem.[169]   The record even contains emails between Mr. Deem and PipeDrive, trying to fix the issue.[170]   It's completely unsupported speculation to assume Mr. Deem was doing all this to cover up a secret scheme to foil Mr. Harris's ability to access PipeDrive.[171]   Bottom line: nothing in the record suggests that Mr. Deem intentionally sent the invitations to the wrong email address.[172]   No reasonable jury could find otherwise.   Because Mr. Harris has no evidence from which a reasonable jury could conclude that Defendants' non-discriminatory reason for failing to provide Mr. Harris access to PipeDrive is pretextual for racial discrimination, Defendants are entitled to summary judgment on these claims.

## C.   Retaliation Claims

The Court assumes—without deciding—that Mr. Harris has made out a prima facie case of retaliation with respect to the denial of access to PipeDrive.[173]   Even then, Defendants are

---

[169]   *Id.* at 1–6.

[170]   *Id.* at 57–58.

[171]   The Court understands that, for purposes of summary judgment, it must take as true that, in late May/early June of 2020, Mr. Deem made the following racially insensitive comments: "black people tend to play the race card" and therefore he "didn't like to hire blacks."   *See* Harris Dep. (Doc. 90) at 89–90.   But the evidence is undisputed that Mr. Deem went to bat with his superiors to transfer Mr. Harris into the new sales position.   *See supra* note 159.   In this context, the single-episode offhand comment made by Mr. Deem is not enough to turn the theory of Mr. Deem intentionally sabotaging Mr. Harris from speculation to reasonable inference.   And that is especially true given that the other Black salespeople all got access to PipeDrive.   See Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 38; Ex. 2 (Pl.'s Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-2) at 4.

[172]   Recall that other employees also had trouble creating a PipeDrive profile.   Ex. 5 (Deem Dep.) to Pl.'s Resp. to Defs.' Mot. for Summ. J. (Doc. 77-5) at 38.   Of course, the access problems for those employees all eventually resolved.   *Id.*   The record doesn't reveal what those problems were or how they were resolved.   But the takeaway point here is that access problems to PipeDrive were not limited to Mr. Harris.

[173]   As the Court understands the operative Complaint, the summary judgment briefing, and the hearing transcript, Mr. Harris's retaliation argument only concerns the lack of access to PipeDrive.   *See* Second Am. Compl. (Doc. 47) ¶ 46; Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 11–14; Oct. 23, 2023 Hr'g Tr. (Rough) at 13:11:44– 13:21:37.   It does not concern his probationary placement, which was decided upon before Mr. Harris engaged in any protected activity.   *See* Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 35–36.   The first possible protected activity occurred in the late May/early June 2020 meeting between Mr. Deem and Mr. Harris.   And the only evidence in the record is that this meeting was set up in part to explain the probationary terms to Mr. Harris.   *See* Ex. 8 (Morbeck Email) to Defs.' Mot. for Summ. J. (Doc. 67-8).

There is a whiff of Mr. Harris alleging that keeping him on probationary status (as opposed to his initial placement on that status) was retaliatory.   *See* Br. in Resp. to Defs.' Mot. for Summ. J. (Doc. 78) at 14.   But, even if that was a live claim, it would not get past summary judgment.   The undisputed record evidence is that Mr. Harris did not meet the sales quotas he needed to meet in order to complete probation.   *See* Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.'

entitled to summary judgment.   The Court's analysis of the last two steps of the *McDonnell-Douglas* test here basically mirrors its analysis of the PipeDrive access issue in the immediately foregoing section on discrimination claims.   To summarize: Defendants say that Mr. Deem kept mistakenly sending the invitation to the wrong email address, which is a legitimate, non-retaliatory reason for failing to provide Mr. Harris with access to PipeDrive;[174] and Mr. Harris has not provided any nonspeculative evidence to suggest that Defendants' proffered reason was pretext for retaliation.[175]   Because Mr. Harris has no evidence from which a reasonable jury could conclude that Defendants' non-retaliatory reason for failing to provide Mr. Harris access to PipeDrive is pretextual for retaliation, Defendants are entitled to summary judgment on these claims.

## CONCLUSION

For the reasons stated above, the Court GRANTS Defendants' Motion for Summary Judgment (Doc. 67).   Defendants are entitled to summary judgment on all claims.

IT IS SO ORDERED this 30th day of September 2024.

LEE P. RUDOFSKY
UNITED STATES DISTRICT JUDGE

---

Mot. for Summ. J. (Doc. 67-6) at 43.   That is obviously a legitimate, non-retaliatory reason to extend probation.   And to the extent Mr. Harris is suggesting that his failure to meet the sales quota was a result of the allegedly retaliatory denial of access to PipeDrive, this is the same claim assessed in the main text.

[174] *See* Reply in Supp. of Defs.' Mot. for Summ. J. (Doc. 83) at 3, 6; Oct. 23, 2023 Hr'g Tr. (Rough) at 12:34:15–12:37:54; Ex. 7 (Part 2 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-7) at 3, 57–58.   It is also worthwhile to note that, while Mr. Harris's protected activity began in late May/early June of 2020, he was never fired from the company.   And when he failed to meet the probationary sales quotas—well after the start of his protected activity—Mr. Harris was given another opportunity to succeed through another probationary period.   *See* Ex. 6 (Part 1 of Defs.' Doc. Production) to Defs.' Mot. for Summ. J. (Doc. 67-6) at 43.   If Defendants were trying to retaliate against him, they could have just let him go at that point.

[175] *See supra* pages 22–23.